NOTICE

Decision filed 07/06/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241283

NO. 5-24-1283

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 24-CF-316 |
| | ) | |
| BLAKE JENNINGS, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court, with opinion.
Justices Boie and Bollinger concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, the defendant, Blake Jennings, was convicted of unlawful use of a weapon by a felon (UUWF) in violation of section 24-1.1(a) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/24-1.1(a) (West 2024)); aggravated battery (*id.* § 12-3.05(a)(1)); and resisting a peace officer (*id.* § 31-1(a)). The trial court imposed a 10-year sentence for the UUWF conviction, followed by up to a 2-year term of mandatory supervised release (MSR), to run consecutively to a 3-year sentence for aggravated battery, followed by up to a 1-year term of MSR. The defendant was given credit for time served for the resisting a peace officer conviction.

¶ 2    On appeal, the defendant challenges the sufficiency of the evidence for his UUWF conviction, the sufficiency of the evidence supporting the aggravating element of aggravated

1

battery, the effectiveness of trial counsel, and the propriety of the sentencing judgment. For the reasons set forth below, we reverse in part and vacate in part.

¶ 3                                   I. BACKGROUND

¶ 4      On the evening of May 26, 2024, Officer Seth Moorman responded to an apartment complex on East Grand Avenue, where he met with Lisa White, Jerry Hall and Rebecca Hall, who reported that a man had been banging on apartment doors, attempting to take property, and allegedly had battered Mrs. Hall. The man had identified himself to Mr. Hall as "Blake Jennings." Officer Moorman was present later, when other officers found the defendant at the apartment complex, matching the description provided by the witnesses. When the defendant did not stop when instructed to do so, he was forced to the ground and tased by another officer. The defendant was searched incident to arrest, and officers discovered three knives in his pocket. The defendant was handcuffed and later arrested.

¶ 5      The State filed its original information on May 28, 2024. Count I alleged attempted robbery in that the defendant knowingly attempted to take property from the person or presence of Mrs. Hall, by the use of force or by threatening the imminent use of force. Count II alleged UUWF in that the defendant, having been previously convicted of a felony, "knowingly possessed a butcher knife and a pocket knife" in violation of subsection 24-1.1(a). Count III alleged aggravated battery in that the defendant knowingly and without legal justification made physical contact of an insulting or provoking nature with Mrs. Hall, striking her in the abdomen with a lawn chair and causing pain, in violation of subsection 12-3.05(a)(1). Count IV alleged that the defendant had resisted or obstructed a peace officer by trying to get away from Officer Moorman after being detained.

2

¶ 6    On July 31, 2024, the State filed an amended information. Count I alleged UUWF in that the defendant had "knowingly possessed a knife with a blade over 3 inches in length," after having previously been convicted of a felony. The substance of the remaining original counts did not change. On August 12, 2024, the day before trial began, the State filed a second amended information, charging the defendant with (1) UUWF, alleging that the defendant, a convicted felon, had "knowingly possessed a knife with a blade over 3 inches in length"; (2) attempted robbery; (3) aggravated battery, alleging that the defendant, while in a public place, "knowingly and without legal justification made physical contact of an insulting or provoking nature with Mr. Hall, in that the defendant struck him in the mouth"; and (4) resisting or obstructing a peace officer.

¶ 7    At trial, Officer Moorman testified that he was on patrol on the evening of May 26, 2024, and responded to a call at Brookside Apartments on East Grand Avenue. The officer stated he met the complaining witnesses at a "circle drive" within the apartment complex. The State offered into evidence two Google Map printouts of Brookside Apartments, depicting aerial images of the roundabout or "circle drive" connecting three parking lots for the apartment complex. Officer Moorman identified video from his body-worn camera, which the State published for the jury.

¶ 8    The video depicted officers meeting with White, Mrs. Hall, and Mr. Hall, to obtain their accounts of the event. The video opened with Mrs. Hall explaining to the officer that a "white guy" had come to her door, asking for a ride, and had stolen stuff from a couple of porches. White joined the conversation and described the man as having buzzed or bald hair. Mrs. Hall explained that the man had hit her with her own chair. White pointed out the direction the man went and said that some other neighbors "said they were missing a pair [of] Jordans off their porch." Mrs. Hall added, "He punched my husband." White explained that the man had on a hoodie, was wearing no shoes, and had bent down and drank from a water puddle. She said she had seen him "sneaking around

3

here before." Mr. Hall said that the man had hit him in the mouth and had identified himself as "Blake Jennings."

¶ 9    The witnesses continued explaining the incident to the officers over the next 15 minutes. They repeated multiple times the claim that the defendant was drinking out of a water puddle "like a dog" and speculated that he was "on something." Mrs. Hall stated multiple times that the defendant had hit her in the ribs with her own chair. Officer Moorman showed the witnesses a photo on his phone, and they all agreed "that's him." Paramedics arrived and spoke with Mrs. Hall, but she declined to leave in an ambulance. During the conversation, Mr. Hall referred multiple times to a "crackhead." Officer Moorman asked the witnesses to describe the incident again from the beginning, which they did.

¶ 10    After the jury viewed Officer Moorman's body-camera video, White testified that she arrived home during heavy rain and saw the defendant carrying her small patio table and one of the Halls' patio chairs. When she asked for it back, he refused and denied the table was hers. White stated that the defendant had been knocking on apartment doors, including hers, asking to come inside, for money or for help getting out of the rain. She said that the defendant was walking away towards the parking lot. She testified the defendant was in the "little roundabout in [the] complex" when she, Mr. Hall, and Mrs. Hall confronted him about the table and chairs. White stated that while they were in the roundabout, things escalated into a physical altercation. As they attempted to retrieve their belongings, White recalled the man exchanging blows with Mr. Hall and hitting Mrs. Hall with the chair.

¶ 11    On redirect examination, the following colloquy occurred:

"Q. So in terms of the location, so you were kind of in that roundabout area outside of—it's close to your apartment building, correct?

4

A. It is.

Q. Okay.

A. Yes.

Q. And so that's out in the public?

A. Yes."

¶ 12 White recalled that the man was barefoot and that he had gotten down on his hands and knees and drank water out of a puddle. She surmised that "he either had drug issues or mental health issues." On cross-examination, White acknowledged that Mr. Hall had a machete during the altercation, although she did not know the full context of the events that occurred before she arrived outside.

¶ 13 Mrs. Hall testified that as she and her husband were watching television, the defendant came to their door asking for a ride. Her husband refused and closed the door. After hearing commotion outside, they looked out and saw White struggling to recover her table from the defendant. Mrs. Hall called 911, grabbed a board, and went outside. Mrs. Hall testified that the defendant had her patio chair and insisted it was his. As she, White, and Mr. Hall tried to reclaim their property, the defendant punched Mr. Hall. Mrs. Hall struck the defendant with her board, and he simultaneously swung her chair at her, striking her in the side. She remembered the defendant identifying himself as "Blake" and wearing a gray hoodie without shoes. Mrs. Hall acknowledged that Mr. Hall possessed a machete but said it was only a plastic Halloween prop. She explained that she and her husband were trying to deescalate the situation because they had "dealt with this kind of drug addiction" in their family.

¶ 14 Mr. Hall testified that the defendant knocked on his door and asked him for a ride. Mr. Hall opined that the defendant was "trashed" and could hardly walk or talk. After refusing the request

5

for a ride, Mr. Hall later saw White arguing with the defendant over the table and went outside. He testified that the defendant struck White several times. Mr. Hall retrieved a toy prop machete in order to scare the defendant. When confronted by Mr. Hall, the defendant struck Mr. Hall in the mouth, leaving bruising and lingering pain. Mr. Hall believed the defendant might have had something in his hand because the blow seemed particularly forceful. Photographs of Mr. Hall's injuries were later introduced.

¶ 15    Mr. Hall struck the defendant on the top of his head. He testified that the defendant "had to be on some serious stuff" because it did not seem to faze him. Defense counsel objected, but the trial court overruled the objection. Mr. Hall confirmed that the defendant also hit Mrs. Hall with a chair. The defendant managed to run from the parking lot through the apartment complex, where he was later located by police officers.

¶ 16    Officer Jeffery Smith arrived later but assisted in the defendant's arrest. Officers located the defendant approximately 20 minutes after Officer Moorman met with the complaining witnesses. Body-camera footage, which was published to the jury, showed the officers repeatedly telling the defendant to stop. Officer Smith's video showed the defendant being taken down by officers, being walked over to a squad car, and being searched incident to arrest before being placed in the back of the police car. At the time of his arrest, the defendant was wearing black shoes. Officer Kenneth Blackburn's body-camera footage mirrored Officer Smith's. While the defendant was still on the ground, Officer Blackburn recovered a knife from him. The officer confirmed the defendant had no furniture items with him at arrest.

¶ 17    Officer Alexander Kraus was one of several officers dispatched to the apartment complex on May 26, 2024, following reports of a white male in a black or dark sweatshirt who had been banging on doors, yelling, and going through property outside the apartments. By the time Officer

Kraus arrived, other officers had already spoken with witnesses who described the suspect's earlier conduct. Shortly thereafter, dispatch reported a second call from residents in a different building in the same apartment complex, identifying the same suspicious individual. Officers converged on Building 11, where they located the defendant, who matched the earlier description.

¶ 18    Officer Kraus testified that he and the other officers approached the defendant with the intent to detain him, based on the witness information received. When the officers ordered the defendant to stop, the defendant initially turned away and began to walk faster before suddenly running. The officers pursued the defendant on foot through the apartment complex. When officers caught up to him, the defendant physically resisted efforts to detain him, pulling away, refusing to place his hands behind his back, and tucking his arms beneath his body. He testified that the defendant remained noncompliant, even after officers attempted verbal commands and physical control techniques. As a result, officers deployed a Taser multiple times. Officer Kraus explained that the use of the Taser was necessary to gain control and prevent the defendant from accessing items on his person. After the final Taser deployment, officers were able to bring the defendant's hands behind his back and place him in handcuffs. Officer Kraus testified that after the defendant was fully restrained, officers conducted a search incident to arrest.

¶ 19    During the search, officers recovered what Officer Kraus described as a four-inch-long silver knife, which body-cam footage showed the officer had initially referred to it as a "f*** butcher knife," a box cutter knife, and a shaving razor from the defendant's sweatpants pocket. All of the items were later admitted into evidence. On cross-examination, Officer Kraus stated that the knife was not serrated like a steak knife. He characterized it as a larger kitchen-style knife. He confirmed that the knife fit inside the pocket of the sweatpants the defendant was wearing at the time of his arrest. When defense counsel questioned whether "butcher knife" was a fair descriptor,

Officer Kraus clarified that the knife was simply a large, non-serrated kitchen knife, not a small folding knife and not a serrated steak knife.

¶ 20    Retired police officer Dan Reed testified that he worked as a civilian evidence technician. Reed placed the knives taken from the defendant into evidence. Reed measured the silver knife blade in court and testified that it was three-and-a-half inches long.

¶ 21    The parties stipulated that at the time of the offense, the defendant previously had been convicted of methamphetamine manufacturing/delivery, a Class 1 felony. The defendant was convicted of this offense on September 12, 2013, and sentenced to nine years' imprisonment.

¶ 22    At the close of the evidence, the defense moved for a directed verdict, which the trial court denied. The defendant declined to testify or present evidence. In closing, the prosecutor argued that the defendant committed UUWF by knowingly possessing a knife with a blade over three inches. The prosecutor added:

> "So what the law is a Category 2 weapon includes a knife with a blade of at least three inches in length, so a convicted felon is not suppose[d] to have a dangerous weapon, and as you can see with your own eyes and as we measured yesterday, it's well over three inches."

¶ 23    The trial court gave all of the jury instructions proposed by the State, with no objections by defense counsel. The State tendered a modified jury instruction labeled "IPI 18.07M," purporting to provide the definition of UUWF as follows: "A person commits the offense of unlawful possession of a weapon by a felon when he, having been previously convicted of a felony offense, knowingly possesses a knife with a blade over 3 inches in length."

¶ 24    The State also tendered Illinois Pattern Jury Instructions, Criminal, No. 18.08 (4th ed. 2000) (hereinafter IPI Criminal 4th) to instruct the jury as to the elements of UUWF, which asked

8

the jury to consider two propositions: (1) whether the defendant "knowingly possessed a knife with a blade over 3 inches" and (2) whether "the defendant had previously been convicted of a felony offense."

¶ 25    Regarding the aggravated battery charge, the State tendered IPI Criminal 4th No. 11.16, which asked the jury to consider two propositions: (1) whether the defendant "intentionally or knowingly made physical contact of an insulting or provoking nature with Mr. Hall" and (2) whether "the defendant did so while on or about a public way."

¶ 26    During deliberations, the jury sent two questions to the trial court. First, the jury sent a note requesting a ruler or measuring device. The parties and the trial court agreed to tell the jury that they had all of the evidence and to continue deliberating. Second, the jury sent a note asking whether self-defense fell under legal justification. The parties agreed to inform the jury that they had all of the necessary jury instructions. Following deliberations, the jury found the defendant guilty of UUWF, aggravated battery, and resisting or obstructing a peace officer.

¶ 27    On November 21, 2024, the trial court imposed an aggregate sentence of 13 years' imprisonment, consisting of 10 years for the UUWF conviction and 3 years for the aggravated battery conviction, to run consecutively, along with a term of up to 3 years MSR. The defendant filed a timely appeal.

¶ 28                                     II. ANALYSIS

¶ 29                              A. Sufficiency of the Evidence

¶ 30    We turn to the defendant's contention that the State failed to prove him guilty of UUWF beyond a reasonable doubt. Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. In determining if there is sufficient evidence

9

to convict, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004). It is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the finder of fact. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. A reviewing court gives the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007). A defendant's conviction will be reversed only where the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Id.* at 115.

¶ 31　The defendant argues that he was convicted of UUWF for his mere possession of a knife "with a blade over 3 inches in length," contending that nothing in Illinois law prohibits felons from merely possessing an ordinary knife, regardless of its length. He maintains that in order for him to be convicted of UUWF based on his possession of a knife, the State would have had to allege and prove that he possessed the knife with intent to use it unlawfully against another. 720 ILCS 5/24-1(a)(2) (West 2024). Thus, he maintains that he was convicted for conduct that does not constitute a criminal offense and that this court should reverse his UUWF conviction.

¶ 32　The State counters that the record establishes that the box cutter knife that the defendant possessed when he was arrested was a switchblade knife that was *per se* unlawful for a felon to possess, regardless of intent. In its brief, the State posits that "[t]he language that the knife blade was 'over three inches in length' can be considered mere surplusage."

¶ 33　We find that the State's argument fails where the State charged, argued, and proposed jury instructions solely on the theory that the defendant possessed a knife with a blade exceeding three

inches in length and where the record contains no evidence or jury instruction concerning the possession of a switchblade or any other *per se* prohibited weapon.

¶ 34　　Under section 24-1.1(a), persons previously convicted of a felony commit UUWF if they knowingly possess a firearm, ammunition, or "any weapon prohibited under Section 241." Section 24-1(a)(1) enumerates *per se* prohibited weapons, including switchblade knives, defined as knives that open automatically by hand pressure applied to a button, spring, or similar device in the handle. Ordinary knives not falling within section 24-1(a)(1) are not prohibited weapons unless the State proves possession *with the intent to use them unlawfully against another* under section 24-1(a)(2). A blade longer than three inches is not among the *per se* prohibited categories. Furthermore, mere possession of a knife is not a crime. *In re Marquita M.*, 2012 IL App (4th) 110011, ¶ 29. Consequently, in order to sustain the conviction, the State was required to prove beyond a reasonable doubt either that the knife at issue was a switchblade or that the defendant possessed a dangerous knife with the intent to use it unlawfully. The State did not pursue either theory at trial.

¶ 35　　Review of the record reveals the charging instrument alleged only possession of "a knife with a blade over 3 inches in length." At trial, the State confined its opening statement, evidence presented to the jury, and closing argument to that theory. The jury instructions likewise directed the jury to determine only whether the defendant, a felon, possessed a knife whose blade exceeded three inches. Here, the instructions given did not authorize the jury to find the defendant guilty based on possession of a switchblade. Further, the State presented no evidence that the box cutter knife opened automatically, and the record contains no witness testimony describing the box cutter. Finally, the jury was never asked to determine whether the knife was a switchblade and did not make such a finding. In fact, the term "switchblade" does not appear anywhere in the record.

11

¶ 36    In *People v. Crespo*, 203 Ill. 2d 335, 344 (2001), the Illinois Supreme Court held that the State may not change its theory of prosecution on appeal. In *Crespo*, the defendant stabbed the victim three times. *Id.* at 340. On appeal, the defendant maintained that his aggravated battery conviction should be vacated because the charge stemmed from the same physical act that formed the basis of an armed violence charge. *Id.* The State contended that the three different stabbings were separate and distinct acts, each capable of independently sustaining each criminal conviction. *Id.* The supreme court noted that although the State could have charged the crime that way and could have argued the case to the jury that way, the State chose not to do so. *Id.* at 344. Thus, the *Crespo* court would not allow the State to change its theory of the case on appeal, reasoning that the charging instrument and trial presentation proceeded on a different factual and legal basis. *Id.* at 343.

¶ 37    The principle in *Crespo* squarely applies to the State's attempt to argue on appeal that the defendant's conviction should be affirmed because one of the knives purportedly was a switchblade. Assuming, *arguendo*, that such a theory could have been charged originally, the State did not charge it, did not argue it, and did not request the jury be instructed upon it. Accepting the State's theory on appeal would require this court to find that the knife was a switchblade, a finding unsupported by the record and never submitted to the jury. We determine that the State's attempt to invoke a switchblade theory for the first time on appeal is foreclosed by *Crespo*.

¶ 38    Neither can the silver kitchen knife sustain the defendant's conviction. Because a kitchen knife is not a *per se* prohibited weapon pursuant to the statute, the State was required to prove that the defendant possessed it with intent to use it unlawfully, but it presented no such evidence. The jury was not instructed to determine whether the defendant possessed the silver knife with unlawful intent. A conviction resting on this item therefore fails for the same reason: the State did not prove

12

the necessary elements beyond a reasonable doubt, and the reviewing court may not infer elements that were neither proven nor found by the jury. The evidence presented at trial, viewed in the light most favorable to the State, does not establish that the defendant possessed a prohibited weapon under section 24-1(a)(1) or a dangerous weapon possessed with intent to use it unlawfully under section 24-1(a)(2). Accordingly, we conclude that the defendant's conviction for UUWF must be reversed.

¶ 39                              B. Aggravated Battery Enhancement

¶ 40    The defendant next contends that his conviction for aggravated battery must be reduced to simple battery where the State failed to prove the locational aggravator pursuant to subsection 12-3.05(c). That subsection elevates simple battery to aggravated battery where the offense occurred "on or about a public way, public property, a public place of accommodation or amusement," or certain other specified locations. 720 ILCS 5/12-3.05(c) (West 2024). The defendant maintains that the State did not establish that the private roundabout within the apartment complex constituted a "public way," relying on principles articulated by the Illinois Supreme Court in *People v. Whitehead*, 2023 IL 128051.

¶ 41    In *Whitehead*, the court addressed whether a stoop leading into a private apartment constituted a "public place of accommodation or amusement" under section 12-3.05(c). *Id.* ¶ 14. Because the statute did not define that phrase, the court consulted dictionary definitions to ascertain its ordinary meaning. *Id.* ¶ 20 (citing *People v. McChriston*, 2014 IL 115310, ¶ 15). The supreme court emphasized that a stoop attached to a private dwelling exists for the convenience of the resident, not the general public. *Id.* ¶¶ 22, 24. Although certain members of the public may access such a location incidentally, the *Whitehead* court explained that "accessibility of a location to the public, standing alone, is insufficient to transform [it] into a public place of accommodation." *Id.*

13

¶ 32. Moreover, interpreting "public place of accommodation" to include any location accessible to the public would render superfluous the statute's separate identification of "public way," "public property," "sports venue," and "domestic violence shelter." *Id.* ¶ 31 (citing *Yang v. City of Chicago*, 195 Ill. 2d 96, 106 (2001)). Although *Whitehead* analyzed the phrase "public place of accommodation or amusement," the court's interpretive principles apply equally to other locational terms contained in the same subsection, including the phrase "public way." The *Whitehead* court's reasoning underscores that each listed location must be given independent meaning and may not be construed so broadly as to collapse the statutory categories. *Id.*

¶ 42     The State maintains that the roundabout was open to the general public in practice and, therefore, functioned as a public way. Relying on a series of appellate decisions that predated *Whitehead*, the State contends that areas accessible to visitors, delivery drivers, residents, and law enforcement—including driveways, parking lots, and shared access roads—fall within the definition of a public way. See *People v. Ward*, 95 Ill. App. 3d 283 (1981); *People v. Crawford*, 2021 IL App (5th) 170496; *People v. Brown*, 2019 IL App (1st) 161204; *People v. Wicks*, 283 Ill. App. 3d 337 (1996). The State asserts that the apartment complex did not have gates or restrictions on entry and that the public regularly accessed the roundabout for everyday purposes, thereby placing this space within the broad line of authority defining privately owned but publicly accessible areas as public ways.

¶ 43     The term "public way" is undefined in the Criminal Code. Merriam-Webster defines "public way" as "any passageway (as an alley, road, highway, boulevard, turnpike) or part thereof (as a bridge) open as of right to the public and designed for travel by vehicle, on foot, or in a manner limited by statute (as by excluding pedestrians or commercial vehicles)." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/public%20way (last

14

visited June 30, 2026). Additionally, we reviewed the State's exhibits, including the two aerial map images of the Brookside Apartments complex located at East Grand Avenue. The maps depict a small circular drive or roundabout situated *within* the apartment complex. The roundabout appears to connect only to internal driveways of the residential property. Nothing in the exhibits indicates that the roundabout forms part of a public thoroughfare. The configuration presented in the exhibits, therefore, suggests private apartment-complex driveways, not a roadway open for general public use. Applying the principles articulated in *Whitehead*, the fact that some members of the public might physically access or traverse the apartment complex does not render the private roundabout a public way. Our state supreme court has made clear that incidental or permissive access by the public cannot satisfy the statutory aggravator and extending "public way" to encompass such areas would result in the same type of redundancy the Court cautioned against in *Whitehead* regarding the phrase "public place of accommodation or amusement." *Whitehead*, 2023 IL 128051, ¶¶ 31-32. Accordingly, consistent with the interpretive principles reaffirmed in *Whitehead*, we conclude that the State failed to prove that the battery occurred "on or about a public way" under section 12-3.05(c). We find that the defendant's aggravated battery conviction cannot stand and must be reduced to simple battery. As a result, we decline to address the defendant's remaining claims of error.

¶ 44                                III. CONCLUSION

¶ 45     The defendant received a three-year sentence for his aggravated battery conviction on November 21, 2024. Simple battery is a Class A misdemeanor (720 ILCS 5/12-3 (West 2024)), which carries a sentence of imprisonment of less than one year (730 ILCS 5/5-4.5-55 (West 2024)). The defendant challenges the enhancement from simple battery to aggravated battery. Because the defendant has already served 18 months, there is no need to remand this cause to the circuit court

15

for resentencing. As to the aggravated battery conviction, we (1) reverse the judgment of the trial court, (2) vacate the defendant's conviction for aggravated battery, (3) enter a conviction for simple battery, and (4) direct the clerk of the appellate court to issue the mandate in 30 days to provide the State with an opportunity to file a petition for rehearing. We further reverse the defendant's conviction for unlawful use of a weapon by a felon.

¶ 46    Reversed in part and vacated in part.

*People v. Jennings*, 2026 IL App (5th) 241283

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, No. 24-CF-316; the Hon. Ralph R. Bloodworth III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Madison N. Heckel, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Marsha Cascio-Hale, State's Attorney, of Murphysboro (Patrick Delfino, Thomas D. Arado, and Richard S. London, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |